# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH
### NO. 02-13-00459-CV


IN THE INTEREST OF L.M.F., A
CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In three issues, Appellant Mother appeals the termination of her parental

rights to her child, L.M.F.  We affirm.

## II. Factual and Procedural Background

L.M.F. is Mother's ninth child.  In 2008, Mother moved to Texas after

relinquishing her rights to five of her eight children so that her sister-in-law could

------

[1]*See* Tex. R. App. P. 47.4.

adopt them.[2]  Mother separated from her husband in 2009 and started dating C.F., L.M.F.'s father.  She moved in with C.F. and his mother in February 2010 after she was evicted from her apartment.

On September 23, 2010, four days after L.M.F. was born, the Department of Family and Protective Services (DFPS) removed L.M.F. from Mother and C.F. after a CPS investigation of two referrals alleging risk of neglectful supervision. The first referral involved Mother's Indiana CPS history and the other alleged that Mother had tested positive for marijuana.  Mother testified that her last marijuana use had been while she was pregnant with L.M.F.  She gave various dates between February and April 2010 to different witnesses regarding her last marijuana use, and she attributed her May 2010 positive drug test to secondhand marijuana smoke and to marijuana remaining in her body's fat cells because she had previously smoked it so heavily.  Mother's illegal drug of choice was marijuana, which she had used on and off since she was around twenty years old to calm herself.[3]

---

[2]Indiana's Child Protective Services (CPS) removed Mother's eight children, who were between the ages of five months and seventeen years, for neglectful supervision related to drug use, domestic violence, and injuries to one of the children.  Mother attributed the loss of her parental rights to choosing her abusive husband over the children, to his having failed a drug test, and to CPS tricking her into relinquishing her rights.  Mother's three older children became adults during this time.

[3]On June 20, 2013, Mother told her Mental Health Mental Retardation of Tarrant County (MHMR) caseworker that marijuana "helps her to relax opposed to the psych medications."

2

DFPS placed L.M.F. with her paternal aunt M.L. and set up service plans for Mother and C.F. that included participating in individual counseling and parenting classes, submitting to a drug and alcohol assessment and random drug testing, obtaining stable housing and income, submitting to a psychological evaluation, and visiting L.M.F. Mother's service plan also included completing a CPS education course to address domestic violence.

CPS's concerns during the 2010 case were drug use, domestic violence between Mother and C.F., unstable housing, and Mother's previous CPS history. During the CPS case, Mother reported to MHMR that she had cannabis and alcohol abuse problems and that she had previously undergone substance abuse treatment in Indiana but had not achieved sobriety in the past. Mother was successfully discharged from MHMR's Community Addiction Treatment Services (CATS) program in December 2010. Mother did not take hydrocodone during the first case.

In March 2011, the trial court ordered a monitored return of the child to Mother and C.F., and in June 2011, it appointed Mother and C.F. as the child's joint managing conservators. A month later, Mother went to John Peter Smith hospital (JPS), where she was diagnosed with acute hepatitis C, a depressive disorder, and "Cannabis Dep-unspec." Mother received prescriptions for Citalopram (hereinafter, Celexa) for depression, Tramadol for pain, and thirty pills

3

of Norco (hereinafter, hydrocodone).[4]  In August 2011, Mother requested a hydrocodone refill and received a prescription for thirty pills with one refill.

In August 2011, Mother reported to JPS that she and her ex-husband had engaged in heavy alcohol use and she admitted "to drinking 12 beers a day for an extended period of time" but said for the past few years, she had only consumed one beer a week.

In September 2011, Mother reported to MHMR that she had been hearing voices; Mother said that she was diagnosed with bipolar schizophrenia (also referred to as schizoaffective disorder) in October 2011 and started taking Risperdal.[5]  Although Mother's MHMR records included patient warnings that Risperdal should not be mixed with alcohol or street drugs, that other drugs should not be taken with Risperdal unless advised by a doctor, and that changing the medication's dose or schedule without psychiatrist approval could cause symptoms to return or other serious side effects, Mother's October 2011 MHMR drug test reflected that Mother tested positive for ethanol.

---

[4]In *In re S.A.G.*, No. 02-09-00125-CV, 2010 WL 1006301 (Tex. App.—Fort Worth Mar. 18, 2010, no pet.) (mem. op.), we took judicial notice that hydrocodone is "a potent analgesic derivative of codeine." *Id.* at *1 n.3 (quoting Stedman's Medical Dictionary 911 (28th ed. 2006)).

[5]Risperdal (Risperidone) is a psychotropic mood stabilizer used to relieve or improve symptoms such as hallucinations, irrational beliefs and fears, disorganized thinking, severe anxiety, apathy, emotional withdrawal, social withdrawal, and mood swings.

4

In February 2012, Mother was admitted to the JPS psychiatric evaluation unit and diagnosed with anxiety and alcohol and cannabis abuse. The Emergency Medical Services summary included in Mother's JPS records reflects that she had said she thought she was having a nervous breakdown and that she had been hyperventilating, screaming in outbursts, and crying. Mother told the doctors at JPS that her current dosages of Risperdal and Xanax were not working. In her emergency psychiatric assessment, Mother described hearing voices and said she had had mental illness "all [her] life." She indicated that she had attempted suicide in the 1980s and still thought about killing herself and said that her last beer had been the day before the assessment. The person conducting the assessment noted, "P[atien]t minimizes her drinking; she gets Xanax from MHMR and outside MHMR."

In March 2012, CPS received a referral alleging neglectful supervision of L.M.F. due to possible drug, alcohol, or prescription drug abuse in the home and Mother's erratic behavior. Mother admitted to the CPS investigator that there had been domestic violence between her and C.F. but said that there had not been any recently, that she was on mental health medication, and that she was using pain medication to treat an ankle injury. The investigator noted that L.M.F. was dressed appropriately and seemed clean, happy, and playful, and nothing in the child's appearance or behavior or the environment and home itself concerned her. When the investigator followed up a month later, Mother told her that she was no longer on pain medication and had started receiving her disability checks,

5

and she and C.F. agreed to a safety plan and family-based safety services (FBSS). The FBSS case lasted for around three months.

In May 2012, an MHMR assessor, updating Mother's comprehensive plan, noted that Mother was "very mild in her demeanor in comparison with how she's been in the past. She appears focused and able to focus on her daughter."

On August 10, 2012, Mother was arrested for public intoxication when she and a male had a loud argument on their apartment's back patio after midnight. The arresting officer described Mother as loud and boisterous, with an odor of alcoholic beverage on her breath; he warned her that if she continued to be loud, he would have to arrest her. Mother "continued to scream and yell that she's going to do what she wants," so he arrested her. Mother testified that the police officer just assumed that she was drunk but that because he did not give her a Breathalyzer test, she was not drunk. Five days after her public intoxication arrest, Mother called MHMR, asked for $300 to help pay her rent, and accused the MHMR staff member of not caring when her request was denied.

In September 2012, Mother asked MHMR to help her become her own Social Security disability insurance (SSDI) payee and MHMR staff filled out a form to help her do so. A September 2012 MHMR report reflects that Mother was doing well on her medications but would hear voices and felt that "God reveals things to [her]."

On November 8, 2012, DFPS received a new neglectful supervision referral alleging domestic violence between Mother and C.F. and that C.F. was

6

abusing alcohol and Mother was using drugs and not taking her medications properly. The CPS investigator who visited the home described L.M.F. as healthy, clean, and dressed appropriately. Mother denied any recent drug use and allowed the investigator to see her Risperdal and Celexa prescriptions and prescription bottles. The investigator was concerned about the excess number of pills in the bottles based on the dates the medications were filled, the quantity remaining, and how many times Mother was supposed to take her medications per day: Mother's Risperdal bottle was filled with thirty pills in April 2012; she was supposed to take one per day, but in November 2012, it was still almost full. Mother told the investigator that because Risperdal made her feel tired, she did not like taking it and would take only half of the pill. She also attributed the quantity of pills to MHMR's having given her ninety pill samples, which she said she used before using the pills in the bottle. The investigator was unable to confirm Mother's statements with MHMR[6] before receiving another referral on November 28, 2012, which alleged domestic violence between Mother and C.F. in an incident that involved Mother throwing canned goods at him. Mother denied the incident until the investigator told her that someone had videotaped it.

During the interview, Mother called the investigator a bitch but then a few minutes later told her that she was responsible, intelligent, and sophisticated,

[6]Mother's MHMR records that were admitted into evidence are from June 1, 2013, until October 7, 2013; they reflect that she received forty-five sample pills of Risperdal on August 20, 2013.

7

hugged her for an extended period of time, and told her that she loved her. Mother spent time during the interview poking a little dog to make it bark at her and told the investigator that her concern about L.M.F. being placed outside of the home was that she might lose her benefits. The trial court granted DFPS's request to remove L.M.F. based on concerns about domestic violence and Mother's mental health medication usage. L.M.F. returned to live with M.L.

Mother and C.F. received new CPS service plans in January 2013.[7] Because C.F. had been incarcerated on a domestic violence charge arising out of an incident on December 30, 2012—a date that Mother had used alcohol—CPS mailed his service plan to him.

The new CPS service plan required visiting the child and participating in an eight-week parenting program, a wellness recovery action plan (WRAP) course, an anger management course, and individual counseling, as well as maintaining appropriate housing, attending Narcotics Anonymous/Alcoholics Anonymous (NA/AA), continuing to work with MHMR, completing a drug and alcohol assessment, and participating in random drug testing. Mother's new service plan mirrored the one in the previous case except for the addition of mental health treatment and the subtraction of the psychological evaluation, which was

---

[7]In February 2013, DFPS moved to consolidate the new case with the previous case, and the trial court granted the motion.

8

completed in the first case.[8]  All of Mother's CPS caseworkers were concerned about Mother's prescription drug use and her mental health.[9]

On January 30, 2013, Mother underwent a psychosocial assessment; the assessor noted,

> Client was not coherent during the assessment and was not able to focus on the questions.  Her parental rights were terminated on 8 of her children.  Client stated that CPS in Indiana "stole her children[."]  She reported that they were removed because they didn't like her home and her son kept getting injuries.  Her one year old daughter is currently in foster care due to drinking, violence, and mental health issues in the home. . . .  Client talked about being videoed throwing can[ned] goods at her boyfriend.  She talked about some violence going on at the home.

The assessor also observed, "Client should continue to be seen at MHMR and can't benefit from additional counseling at Merit at this time.  Client appears to be mentally unstable and should obtain a psychological evaluation to determine her intellectual ability to care for her child."

Mother and her first counselor developed three long-term goals when Mother began individual counseling in April 2013:  to eliminate all physical aggression in her relationship, to change thinking and behavioral patterns that create conflict or interfere with attempts to achieve desired outcomes, and to

---

[8]Mother's 2010 psychological evaluation was not submitted into evidence.

[9]Mother's CPS caseworker in the first case received the second case in November 2012 and worked on it until she left DFPS in June 2013.  Mother's next CPS caseworker had the case from June 2013 until October 2013, when she became a CPS kinship worker.  When she left the case, her CPS supervisor, who had supervised both Mother's 2010–2011 case and the instant case, took over.

achieve a level of competent, effective parenting.[10]  Mother's four short-term counseling goals were to attend individual sessions as recommended, to identify the behaviors that typically signal the escalation toward violence, to identify an effective style of parenting, and to express feelings of frustration, helplessness, and inadequacy associated with parenting.  Mother told her first counselor that she did not feel like she needed counseling because she already saw a counselor through MHMR and said she was going to "fake it" until the counselor told her that she would be discharged.  Mother then changed her attitude and became more engaged.

After five sessions, Mother's first counselor gave up in May 2013, noting that Mother was not making progress, that mother "appear[ed] to not have the mental capacity to process her feelings," that mother did not feel that she had any issues, and that mother needed to be treated for medication management because she seemed to lack the cognitive ability to participate successfully in counseling.  Mother's new counselor began seeing her in June 2013 and retained the same counseling goals.

Mother subsequently admitted to having thrown cans at C.F.  She blamed the new CPS case on the can-throwing incident and on C.F. because they had fought and she "lost her impulse, and threw cans at him."  Mother told one of her CPS caseworkers that L.M.F. was in the room when she threw the cans at C.F.

---

[10]Mother signed the treatment plan, indicating that she had helped create it and that she understood her goals.

but said that she did not think she could have hit the child because she did not intend to throw the cans at her. At trial, Mother testified that she recalled telling the CPS caseworker about the can-throwing incident but said, "I just tossed a couple." Mother testified that L.M.F. was in the apartment when she threw the cans at C.F. but that the child was not in the room when it happened.

Mother also told her CPS caseworker that she and C.F. would get into fights and that he had abused her and threatened her son with a gun. Mother told the supervisor of her Court Appointed Special Advocate (CASA) volunteer that she called the police on C.F. in the past because they regularly fought and he was abusive to her. The trial court admitted a copy of C.F.'s May 10, 2013 judgment of conviction, which reflects that in exchange for three years' confinement, C.F. pleaded guilty to having committed "Assault Family/Household member with previous conviction," causing bodily injury to Mother. The judgment of conviction listed the date of the offense as December 30, 2012, and the indictment alleged that C.F. had intentionally or knowingly caused bodily injury to Mother by hitting her with his hand.

Mother denied to her CPS caseworker and at trial that an actual assault had occurred, explaining that she had just been in the wrong place at the wrong time:

> See, we was in the kitchen, and [C.F.] and the guy that we was staying with, they got into it, and I got in the middle, you know. I went down. So the people in the house said that he pushed me. He didn't push me.

11

> I got in the middle of them, and I, you know, went down. But he didn't put his hands on me, not at all. That's why I went to go sign that paper to try to get him out of jail. But me and him don't have no history about no domestic violence or nothing.

Mother testified that C.F. had never hit her and that she had never hit him.

The CPS supervisor noticed Mother's speech and behavior during Mother's May 7, 2013 visit with L.M.F. and asked Mother to talk with her in the room next door. When Mother sat down next to her, she immediately smelled an alcohol-like odor. Mother's speech was very slurred, but she denied having had any alcohol since December and said she had only taken hydrocodone and Soma that morning. When the CPS supervisor attempted to administer an oral swab drug test, Mother had a hard time following the instructions but told the supervisor, "You know, I ain't stupid, I'm not stupid, bitch; I know how to do it." Because of Mother's behavior and mental state, the supervisor had the case aide take L.M.F. away and tried to discuss with Mother her use of prescription pain medication and muscle relaxers. Mother was not forthcoming and kept asking her "why [she] was all in her business."

When the CPS supervisor asked Mother about her mental health medications, Mother would not let her see the bottles but told her, "See, I got my pills, I got my pills." After Mother put the bottles back in her purse, she paused, reached back in, pulled out a pill, popped it in her mouth, and said, "Oh, I forgot to take my Celexa today." The CPS supervisor testified that she did not know what pill Mother had taken.

Over the course of the case, MHMR adjusted Mother's mental health medications when she complained that they were not working, switching her from Celexa to Prozac in May 2013, but then discontinuing the Prozac in June 2013 because "it made her 'hyper,'" and switching her to Mirtazepine. Mother received her other medications—Soma, Xanax, and hydrocodone—through JPS. On May 3, 2013, JPS doctors prescribed Xanax in a quantity of ninety pills with three refills, Soma in a quantity of 120 pills with three refills, and hydrocodone in a quantity of 120 pills with three refills. Noted on the hydrocodone prescription is, "Each Refill must last 45 days."

On May 16, 2013, MHMR updated Mother's comprehensive plan and noted that Mother was appropriately dressed and maintained eye contact but was hypertalkative and reported being extremely anxious about her CPS case. C.F. died in jail that month, and at the May 30, 2013 permanency hearing, DFPS changed its primary permanency goal to relative adoption because Mother had not completed any of her services at that point, although she was participating in parenting classes, anger management classes, visitation, and counseling.

Mother revealed violent tendencies and continued to hear voices during the case. On June 20, 2013, her MHMR caseworker noted that Mother said she felt homicidal about "this guy disrespecting her mother," and showed the caseworker the knives that she would use "if she have [sic] to." In July 2013, Mother told her CPS caseworker that she could see devils on people and heard voices. When her CPS caseworker asked her in September about what had

13

happened in late July 2013 with her prescriptions, Mother told her CPS caseworker that her son had stolen her medications and that she threatened him because she was angry. Mother told her counselor that she had threatened her son with a knife because she suspected he had stolen her medications out of her purse and was selling them. At trial, Mother denied that her son had stolen her medications and denied that she had ever pulled a knife on him. Mother said that her son had thrown away her medications because he did not know what they were for and that she took him to MHMR so that they could explain because she had hidden her bipolar condition from him. Mother said that after her son talked with her psychiatrist, her psychiatrist refilled her prescription.

Mother did not test positive for any illegal substances on the two drug tests that CPS administered to her or in the tests MHMR administered to her. She completed her substance abuse assessment in July 2013, but the assessment did not result in any recommendations because Mother told the CATS assessors that "she takes her medication as prescribed, that she doesn't have issues with it because she's prescribed her hydrocodone and Xanax, Celexa, [R]isperd[al], and Soma." Mother's CPS caseworker said that when she asked Mother whether she had told the CATS assessors about her prescription medication, what she was using daily, and her normal medication list, Mother told her that it was none of their business or hers.

On August 12, 2013, Mother reported to her MHMR caseworker that she had experienced audio and visual hallucinations, that she felt like someone

14

wanted to kill her, and that she "sees shadows of the demons." She also told her MHMR caseworker that CATS would not take her because she had been "clean" for over ninety days. On the same day, JPS staff noted that Mother had been told that her doctor would need to see a police report to "consider replacing her medication for Soma, and another pain medication instead of hydrocodone," and Mother had agreed to bring in a police report. Two days later, however, Mother was brought to the JPS emergency room when the bus she was riding was involved in a collision, and she was given a prescription for hydrocodone.

On August 15, 2013, Mother showed her Celexa and Risperdal bottles to her CPS caseworker, who was concerned because the Celexa prescription had been filled for thirty pills on July 10, 2013, and still had fifteen to twenty pills in it, and the Risperdal bottle, filled for sixty pills, also appeared to be more than half- to three-fourths full. When she mentioned her concern that Mother was not taking the medication as prescribed, Mother told her that it was none of her business and that she did not need to worry about it. Mother's CPS caseworker said that Mother did not have any hydrocodone, Xanax, or Soma left on the prescriptions that were supposed to last her until November 2013. The CPS supervisor described Mother as very protective of her new hydrocodone prescription, stating that Mother "immediately jumped up and walked over to [her] and, you know, in a laughing way, [Mother] was like, 'Girl, give me my prescription.'" She said that Mother wanted the hydrocodone prescription back, took it from her, and put it inside the home.

15

Mother described her August 15, 2013 discussion with the CPS caseworker and CPS supervisor about her prescriptions as,

> I feel that they was stereotyping me, labeling me, slandering me, because [the CPS supervisor] said, you do have a problem, just admit it. I can't admit to something that I don't have. I just feel— they just made me feel awful, like a piece of trash or something, hollering at me.

Mother said that although the visit had started off well, when the caseworkers told her they would terminate her rights to L.M.F. if she did not admit to having a problem, she told them that she could do it but would also say that her caseworkers made her do it.

On August 20, 2013, Mother reported to MHMR that she still occasionally had audio hallucinations but that they were "'good voices' that tell her to 'keep trying and do the right thing.'" Mother complained to MHMR that she felt fatigued during the day after an increase in her Risperdal dosage, but the doctor noted that Mother was also taking Soma, hydrocodone, and Xanax during the day as well and discussed with Mother that all of these medications, especially in combination, are sedating, have "addictive potential," and can cause "daytime somnolence, impaired judgment."

On August 23, 2013, Mother was brought to the JPS emergency room by the police because she had told police officers that she was going to get a knife and stab people and take an officer's gun and shoot people. Her condition was described as "PMH of paranoid schizophrenia, bipolar type 1 disorder. *Has not taken medication recently. Drank alcohol last night.* . . . Denies drug use.

16

Positive for homicidal ideation towards CPS workers.  Denies suicidal ideation and auditory/visual hallucinations.  Denies physical harm towards her." [Emphasis added.]  Mother's psychiatric condition was further described as,

> Her mood appears anxious.  Her affect is angry and inappropriate.  Her speech is rapid and/or pressured.  She is agitated, aggressive and combative.  She is not actively hallucinating.  Thought content is paranoid.  She expresses impulsivity and inappropriate judgment.  She exhibits a depressed mood.  She expresses no suicidal ideation.  She expresses no suicidal plans.  **Patient states she wants to hurt the CPS workers she is working with**[.]

Mother's inpatient record stated that her insight into her mental illness was poor and "[p]atient does not understand need for treatment."  It also reflected that Mother's judgment concerning everyday activities and social situations was poor.

One of the JPS doctors noted that although Mother claimed to have had only one beer, she was intoxicated and belligerent, smelled of alcohol, and had a blood alcohol level of "262."  Mother's drug test was negative for illegal drugs.  At one point, Mother broke through her restraints; Fort Worth police officers remained at her bedside.  JPS staff sedated her with Haldol and Ativan.

The next day, Mother told JPS staff that she had gotten into a fight with her son and claimed that he had stolen her purse and would be going to jail; she also admitted that she had been drinking as part of her birthday celebration.  Mother was discharged from JPS on August 24, 2013, with the diagnosis of "episodic mood disorder."

17

At trial, Mother testified that she was taken to JPS on August 23, 2013, for an anxiety attack and denied that she had been drunk or drinking on that occasion, although she acknowledged that she had had a margarita on August 22 to celebrate her birthday. Mother denied that she had taken any pain pills on August 22, and she insisted that the only time in the case that she had missed taking her mental health pills was during three days in August.

Mother did not tell her counselor about the August 23 incident until mid-September and did not tell her counselor or CPS caseworker that she had been taken to JPS by the police. When she told her counselor about the incident, Mother attributed it to having not taken her medication for three days. When her counselor tried to make a plan with Mother to avoid future incidences, Mother denied the need for such a plan, told her that it would not happen again, and reported that her only plan was to always take her medication. Mother told her counselor that she just had not wanted to take the medication on those days.

On September 17, 2013, L.M.F. fell from the couch during her visit with Mother. Instead of checking on the child, who had started crying, Mother just stood there and said, "Get up, baby, you okay, you going to be okay." Mother's CPS caseworker had to direct Mother to check on the child. Mother told her CPS caseworker that she had more mental health pills than could be accounted for because she did not have the money to pay for them on the date the prescriptions were filled and paid for them "later, much later in the month." However, Mother also testified that MHMR covered the cost of her mental health

medications and would do so until her Medicaid started. Mother paid for the rest of her medications.

The CASA supervisor visited Mother's home on the evening of September 17, 2013.[11] He testified that Mother told him that when she did not take her mental health medication, she had "episodes" and that one of these episodes happened in late August, when she chased a little girl around the apartment complex with a butcher knife. At trial, Mother denied having chased anyone in her neighborhood with a knife or having chased any of the children in her apartment complex.

The CASA supervisor also testified that when he asked Mother about her prescription medication, she told him

> [t]hat she got prescription for 120 hydrocodone pills, and she had got one—got a prescription filled July the—July the 23rd and that she got another one filled early August. And so [he] asked her had she used all her medicine, and she told [him] that she didn't have any— any more hydrocodone left. [He] asked her how many pills w[ere] in each prescription, and she told [him] it was 120.

He took this to mean that Mother admitted using 240 hydrocodone pills from July 23, 2013, to September 17, 2013. The CASA supervisor testified that Mother first told him that her son had stolen her medicine but then "finally said that she

---

[11]The CASA supervisor testified that Mother called and invited him; Mother said that she did not. During cross-examination, the CASA supervisor agreed that Mother's counsel had not given him permission to talk with Mother and that Mother's counsel had told him to stop talking with Mother.

took them" and admitted that she had a problem.[12] He asked her why she did not address the problem in counseling, and Mother told him that she would talk to the counselor and seek treatment to get her prescription abuse addressed.[13]

At trial, Mother denied having taken 240 pills in two months, said that taking 240 pills of hydrocodone in one month would be impossible, and said that she did not have two prescriptions of 120 each and that "[y]ou only get one prescription every 45 days." Mother said that the CASA supervisor's testimony included "a lot of things . . . that were untrue," denied having taken too many pain killers or muscle relaxers during the case, and denied having had an alcohol abuse problem in the past.[14]

Mother testified that she was still taking Soma but did not have any Xanax or hydrocodone left and would not have any more until she saw her doctor in February. Mother said she took Soma for cramps caused by so many pregnancies and for an ankle injury; she had been taking Soma "off and on"

---

[12]The CASA supervisor testified that he said, "'[S]o you mean your son stole your medicine?' And she said, 'You know what, I'm going to just go on and be truthful with you, I took the medicine, they're gone.' I said, 'Where are they at?' She said, 'They're all gone, I took them, I used them.'"

[13]The October 8, 2013 CASA report reflects that Mother also told the CASA supervisor that within the past few months, she had stopped abusing her pain medicine but often shared it with her adult son.

[14]Mother said that she drank alcohol "[p]robably every once in a while," such as having a margarita or daiquiri with her mother if they went to Red Lobster or on special occasions. She said that she understood that drinking alcohol with pain medication could be dangerous to her health and that she did not drink alcohol with pain medication.

since she was twenty years old and was supposed to take it four times a day as needed, depending on her pain level. Mother testified that the last time she had prescriptions for Xanax and hydrocodone was at the end of July 2013, that the prescriptions had been written for thirty to forty-five days, and that no doctor had given her any ninety-day prescriptions.

During Mother's September 23, 2013 counseling session, Mother refused to discuss what would happen if L.M.F. were not returned to her, although she said that "things were going to hit the fan" if the child were not returned; Mother firmly believed that the child would be returned to her. Mother's counselor observed that Mother's responses "were very calculated so as not to tell [her] what was actually going on," and that any time she asked Mother about her anger, drug use, or mental health issues, Mother would say, "That's not an issue with me, I'm fine, I can control it."

Mother's counselor stated that Mother had not been successfully discharged from counseling because, although Mother had never missed a scheduled session, her thought process appeared to be focused on completing the CPS tasks rather than making progress in addressing her issues and changing her behavior. The counselor did not think that Mother had made progress in addressing her issues.

While the bulk of the case focused on Mother's mental health and her medications, Mother and DFPS's witnesses also testified about Mother's employment, income, support network, and housing. At the conclusion of the

21

first CPS case, Mother and C.F. had both been employed part-time, Mother was receiving food stamps, and Mother had qualified for temporary assistance for needy families (TANF). During the second case, Mother was unemployed, although she had an associate's degree in business management and had worked for the Gary Housing Authority for around ten years before moving to Texas. Her income consisted of disability payments, which were reduced when L.M.F. was removed from her. MHMR covered the cost of Mother's mental health medications. Mother and her mother told Mother's MHMR caseworker in June 2013 that they needed food, but Mother's MHMR progress notes also indicate that Mother "[g]ot her nails done; bought new dresses" at the end of that month. In August, Mother told her CPS caseworker that she did not have the money to pay for her other medications, which cost around $100. When her CPS caseworker asked her why she could not afford them, Mother told her that she paid rent and went on "outings with her mother, including going out to eat and things of that nature."

Mother testified that the last time that she worked was at a telemarketing job in 2010 for a couple of weeks. After she was let go for not making enough sales, she received unemployment, and her family helped her out financially, as did different agencies until she started receiving disability payments. Mother said that her monthly disability benefit was $793 and that her mind was not on employment at present; her plan was to go back to school for business management, and her job would be to take care of L.M.F. The CASA supervisor

22

testified that Mother told him that she gave her mother $50 per month to help with rent, helped pay her son's cell phone bill and other bills, and sent money to her daughter who lived out of town. Mother indicated to the CASA supervisor that she needed help with paying for housing because although the State had given her an allowance for housing, without an increase, she could not afford a place for her and L.M.F. Mother testified that her support network was her mother, relatives in Indiana, and two grown sons, who had cars and would help take her and L.M.F. to activities like "going to the zoo, going to the store."

Mother testified that she lived in an apartment with her sixty-four-year-old mother, who is also bipolar. Mother said that her mother was not on "housing," that they paid full rent, which was $400 per month, and that Mother was on a housing list.[15] Mother said that she had a toddler bed for L.M.F. and that it would go in the living room. Mother's CPS caseworker testified that Mother's mother was on government assistance with housing and that she was concerned about Mother's housing situation in August 2013 because there was no place in the apartment designated for Mother or L.M.F. and there did not appear to be sufficient space for a toddler bed.

DFPS and CASA recommended terminating Mother's parental rights. The trial court took judicial notice of the October 8, 2013 CASA report, which reflected that L.M.F. was thriving in M.L.'s home and had a loving bond with M.L. and that

---

[15]Mother's MHMR records reflect that on August 12, 2013, she told her MHMR caseworker that she was on a waiting list for section 8 housing.

23

M.L. wanted to adopt L.M.F. if the trial court terminated Mother's parental rights. The CASA report also stated that prior to his death, C.F. had named M.L. as a desired placement for the child, that the child had been living with M.L. for more than nine months, and that prior to this case, L.M.F. had lived with M.L. for the first year and a half of her life. The CPS supervisor stated that L.M.F. saw M.L.'s home as her home and was excited to go back there after visits, that M.L. wanted to adopt L.M.F. and was licensed to adopt, and that DFPS's plan for the child if Mother's parental rights were terminated was adoption by M.L.

Mother's CPS caseworkers described L.M.F. as well-adjusted and very bonded with M.L., who provided the child with a loving, structured, appropriate, and stable home and everything she needed. The CPS caseworkers supported terminating Mother's parental rights to L.M.F. as in the child's best interest because of Mother's erratic behavior, inability to recognize her anger and lack of impulse control, failing to take her mental health medication, and abuse of prescription pain medication and alcohol. One of the CPS caseworkers stated that Mother's failure to maintain her mental health medication and to maintain sobriety placed L.M.F. at risk because her reaction to the medication or lack thereof could present threats to Mother's life as well as affect her ability to provide daily caregiving and to parent the child. The CPS caseworker said, "You're not able to parent, in my opinion, if you're not able to maintain yourself mentally and you're taking other medications that are going to change your conduct, going to change your pattern of behavior." The CPS supervisor said

24

that she was concerned about Mother's overall mental stability and "what that would look like for a child who's three to have to go through days of good days with mom and bad days with mom and what [e]ffect that will have on her long term."

The CPS caseworkers and supervisor recommended termination of parental rights instead of permanent managing conservatorship with a relative because Mother's involvement with L.M.F. could be destructive to the child and difficult for her,[16] because the goal for the child was permanency, and because at that time, termination and adoption by a relative who could provide a safe and stable environment appeared to be the most permanent outcome for the three-year-old child.[17] The CPS supervisor further added that permanent managing conservatorship with relative placement would open the child to possibilities of attempted modifications in the future, threatening the child's stability.

When asked if she would have done something differently at the beginning of the case, Mother said, "I could have chose a different caseworker that was someone that's going to work with me and not slander me." With regard to her

[16]The CPS supervisor said, with regard to Mother's overall mental stability, that based on Mother's actions throughout the case, Mother's behavior was not at a point that she could safely say that Mother should have any contact with L.M.F.

[17]The CPS supervisor agreed that she had supported returning L.M.F. to Mother in the first case but said that during that case, Mother had made significant progress in addressing CPS's concerns, had maintained stable housing with C.F., had a good working relationship with CPS, and was open and honest about issues or concerns that CPS had during the case.

caseworkers, Mother said that it seemed like when C.F. died, "they just want to give my baby to his sister [M.L.], and that's not right. My baby belong with me. She all I got to fight for, the last one."

Mother said that since the case started in October 2012, she felt that she had improved with her anger management and by "not jumping into no more relationships." She stated that she thought she had improved to the degree that she could capably care for L.M.F. and that she had done everything she was supposed to do. With regard to L.M.F., Mother testified,

> I'm a very good mother. When my baby is returned back to me, my baby will never be in CPS ever again because all of this is really old. I'm taking care of my mental health. I'm not doing anything, no—nothing wrong. I'm not running the streets. I'm not doing nothing wrong. I'm doing—I go to church. I pray a lot. I enjoy music. I sing. I'm a great mother. And all I need is a chance with one of my kids.

> And, like I say, I will never be in a relationship with—me and relationships just don't work

> . . . .

> I just want my—my child. I just want my child. I deserve my child.

The trial court terminated Mother's parental rights to L.M.F., finding that she had knowingly placed or knowingly allowed L.M.F. to remain in conditions or surroundings that endangered her physical or emotional well-being; that she had engaged in conduct or knowingly placed L.M.F. with persons who engaged in conduct that endangered her physical or emotional well-being; and that termination of Mother's parental rights to L.M.F. would be in L.M.F.'s best

26

interest.[18]  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2) (West Supp. 2013).  This appeal followed.

### III.  Termination of Parental Rights

In her first two issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's endangerment findings under section 161.001(1)(D) and (E).  In her third issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's best interest finding.

### A.  Standard of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child.  *Id.* § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (West 2008).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief

---

[18]Despite Mother's mental health issues, DFPS did not have to seek termination under section 161.003.  *See In re K.G.*, 350 S.W.3d 338, 351 (Tex. App.—Fort Worth 2011, pet. denied) (noting that section 161.003 is not the exclusive way to terminate the parental rights of someone with a mental illness or deficiency).

or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

28

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D) or (E) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Endangerment

Mother argues that the evidence was legally and factually insufficient to support the trial court's endangerment findings because DFPS's evidence regarding her behavior and its effect on L.M.F. "was so cursory, deficient, and unscientific as to amount to no evidence at all."

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally,

29

termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. To determine whether termination is necessary because of endangerment, courts may look to parental conduct both before and after the child's birth. *J.T.G.*, 121 S.W.3d at 125 (citing *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.)). A mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. *Id.* (citing *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.— Fort Worth 2002, no pet.)). The specific danger to the child's well-being may be inferred from parental misconduct alone. *See Boyd*, 727 S.W.2d at 533; *see also In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied) (stating that the factfinder was not required to ignore a long history of dependency and destructive behavior, including abusing drugs and alcohol, in considering endangerment); *see also In re D.T.*, 34 S.W.3d 625, 636–37 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g) (stating that evidence of conduct before child is born, as well as evidence as to how a parent has treated another child, is relevant regarding whether a course of conduct under section 161.001(1)(E) has been established).

30

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *R.W.*, 129 S.W.3d at 739. Further, "although mental incompetence or mental illness alone is not grounds for terminating the parent child relationship [under section 161.001(1)], 'when a parent's mental state allows [her] to engage in conduct [that] endangers the physical or emotional well-being of the child, that conduct has a bearing on the advisability of terminating the parent's rights.'" *Maxwell v. Tex. Dep't of Family & Protective Servs.*, No. 03-11-00242-CV, 2012 WL 987787, at *9 (Tex. App.—Austin Mar. 23, 2012, no pet.) (mem. op.) (quoting *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ)). Mental health issues that are frequently untreated, especially when combined with delusions, hallucinations, a diagnosis of paranoid schizophrenia, and an unwillingness or inability to appreciate the consequences of failing to treat those issues, can present a substantial risk to a child's safety. *See id.* at *9–11 (finding evidence factually sufficient under section 161.001(1)(E) when, among other things, mother failed to treat her severe mental illness during the pendency of the proceedings even though she was aware that doing so was essential to reunification with her daughter); *see In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (considering domestic violence, mother's mental state, and her history of noncompliance with her medication as factors endangering the child's well-being); *C.D.*, 664 S.W.2d at 853 (finding evidence sufficient to support endangerment when mother was on medication for

31

paranoid schizophrenia at the time of trial, had been violent in the past because of her condition, had attempted suicide and made threats to attempt suicide, had been hospitalized over twenty times, and had destroyed property and attempted to steal a helicopter).

A parent's failure to take medication can also expose a child to endangerment of her emotional or physical well-being. *See In re L.L.F.*, No. 02-11-00485-CV, 2012 WL 2923291, at *15–16 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.) (holding evidence of endangerment sufficient based on mother's failure to take her bipolar medication, her guarded long-term prognosis without medication, and her drug use while pregnant, aggressive behavior, and criminal convictions); *see also In re M.A.P.*, No. 02-11-00484-CV, 2012 WL 2036457, at *8–10 (Tex. App.—Fort Worth June 7, 2012, no pet.) (mem. op.) (holding evidence of endangerment sufficient when mother continued to associate with violent father, used marijuana around infant and during the CPS case's pendency despite knowing that using it exacerbated her schizophrenia, and failed to take her mental-health medication). And "[d]omestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment." *J.I.T.P.*, 99 S.W.3d at 845.

Mother complains that DFPS did not sufficiently prove that her prescription drug use, mental health issues, and the alleged domestic violence in her home threatened L.M.F., but she admitted during the trial that she had smoked marijuana while pregnant with L.M.F. and that she had thrown canned goods at

32

the child's father while the child was in the home.  She also relinquished her rights to five other children after Indiana's CPS investigated earlier domestic violence and drug use in her home.[19]  Mother has schizoaffective disorder and heard voices before and during the case; two months before trial, she stopped taking her mental health medications for three days, had a margarita, and ended up at JPS in restraints because she had made threats about stabbing and shooting people.[20]  Instead of making a plan for the next time she stopped taking her mental health medications, Mother told her counselor that it would not happen again.

Throughout the case, Mother denied having a substance abuse problem with her prescription pain pills, marijuana, or alcohol or trouble managing her mental health medications.  However, the record reflects that Mother frequently

---

[19]Although Mother also argues that she denied that she hit C.F. or that he hit her, that C.F.'s assault conviction arose from her intervention in his altercation with a third party, and that DFPS never put on any evidence to contradict her testimony, the record reflects that prior to the instant case, Mother told a CPS investigator in March 2012 that there had been domestic violence between her and C.F., and that during the instant case, she told one of her CPS caseworkers that C.F. had abused her and threatened her son with a gun, she told the CASA supervisor that she called the police on C.F. because they fought regularly, and she told her MHMR caseworker that her last abusive boyfriend was the father of her child and had died in jail.  After C.F. died, Mother told her counselor that a male friend had hit her and that she had hurt him, following the domestic violence pattern she had established first with her ex-husband and then with C.F.

[20]The CASA supervisor testified that Mother told him that when she did not take her mental health medications, it created situations like the August butcher-knife "episode" that she described to him.  Mother denied that this episode occurred.

33

appeared erratic and lacked impulse control and that she would become overly emotional, incoherent, and unable to maintain her focus on conversations or activities such as her visits with L.M.F. When confronted about her coping, parenting, and medication management skills, Mother would become defensive, argumentative, and rude. Mother could also be loud and disruptive—C.F.'s family did not include her in his burial services because "she shouts out loud too much"—and she had difficulty drawing connections between her past and present behavior and the risks that behavior presented to her child.[21]

Further, despite Mother's contention that pill counting by CPS workers and the CASA supervisor amounted to a "haphazard analysis" when DFPS did not put on any evidence as to the nature of hydrocodone, the drug's side effects or impairment potential, the strength of her prescription, and the prescription's recommended dosage or introduce any drug test results to substantiate its prescription drug abuse allegations, Mother's CPS caseworker and CPS supervisor testified that in August, Mother had no hydrocodone, Xanax, or Soma

---

[21]Mother's MHMR records reflect that on June 4, 2013, Mother called MHMR to request a letter from medical staff "stating that she's mentally stable and able to care for her child." When the MHMR staff member explained to Mother that MHMR could only provide her with a diagnosis letter along with her current prescribed medications, Mother stated, "I don't want that! CPS is trying to terminate my rights and I need this letter! [A staff member] filled out paperwork for social security stating that I could be my own payee[,] so what's the difference?" When the MHMR staff member tried to explain to Mother that becoming her own SSDI payee and having custody of her child were two totally different, unrelated issues, Mother accused the staff member of acting like she did not care.

left of the supply that was supposed to last her until November. Mother's JPS records show that Mother tried to obtain another prescription on August 12, 2013, claiming theft,[22] and then obtained a hydrocodone prescription two days after the bus accident.

On August 15, 2013, Mother showed the new hydrocodone prescription to her CPS supervisor. Her CASA supervisor testified that by September 17, 2013, Mother had had a hydrocodone prescription for 120 pills filled on July 23 and another filled in early August and did not have any hydrocodone left, and Mother testified in November 2013 that she did not have any hydrocodone left on the July prescription; she did not mention the August hydrocodone prescription.[23]

Mother also contends that DFPS failed to call expert witnesses to testify about her mental health as it related to her parenting ability and did not introduce her 2010 psychological exam into evidence and that the difference between her behavior observed by MHMR and CPS workers "must bring into question the purpose and credibility of [DFPS's] witnesses." However, the factfinder was the judge of the witnesses' credibility, *see J.P.B.*, 180 S.W.3d at 573, 574, and

---

[22]Mother's CPS caseworker and her counselor both testified that Mother told them that her son had stolen her medication so she had threatened him with a knife, but Mother denied that her son had ever stolen her medications or that she had ever pulled a knife on him.

[23]Mother testified that no doctor had given her ninety-*day* prescriptions, and her JPS records include photocopies of her prescriptions from May 3, 2013, showing that she received a ninety-*pill* prescription for Xanax and 120-pill prescriptions for Soma and hydrocodone.

35

Mother's MHMR and JPS records, rather than contradicting Mother's CPS caseworkers' concerns, showed that Mother had been hearing voices and drinking alcohol with her medications contrary to medical advice, providing the trial court with ample evidence of Mother's behavior to determine whether her failure to appropriately treat her mental health issues endangered L.M.F.

From the testimony and other evidence in the record as set out above, the trial court could have reasonably formed a firm belief or conviction that Mother had endangered L.M.F. by smoking marijuana during her pregnancy with the child, by exposing the child to domestic violence prior to the child's second removal, and by a consistent pattern of failing to adequately treat her mental health issues and avoid using alcohol, which would endanger the child's physical and emotional safety if the child were returned to her. Therefore, under the standards of review set out above, we conclude that the evidence is both legally and factually sufficient to support the trial court's finding under section 161.001(1)(E), and we overrule Mother's second issue. *See H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573; *see also In re I.D.J.*, No. 02-11-00367-CV, 2012 WL 2135579, at *3–8 (Tex. App.—Fort Worth June 14, 2012, no pet.) (mem. op.) (holding evidence of endangerment under section 161.001(1)(E) legally and factually sufficient when, among other things, mother smoked marijuana while pregnant and exposed child to domestic violence prior to the child's removal). And because, along with the best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a

36

judgment of termination, we do not reach Mother's first issue with regard to section 161.001(1)(D). *See In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

## C. Best Interest

In her third issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's best interest finding.

While there is a strong presumption that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others who have access to the child's home; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

37

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Mother argues that the evidence is legally and factually insufficient to support the trial court's best interest finding because "the only credible evidence was that the child flourished in the mother's home and any mental health issues she had did not directly or indirectly impact the child." In support of her best interest argument, Mother argues that at CPS's November 9, 2012 visit to her home, the child was healthy, clean, and dressed appropriately and that the CPS

38

investigator's main concern was that L.M.F. did not listen very well to her parents. Mother contends that nothing in the record showed that L.M.F. suffered emotional or physical harm in her home and that there was no evidence of medical neglect, physical abuse, failure to thrive, or health issues. Mother argues that she attended parenting classes and individual counseling, completed a drug assessment, made almost all of her visits with L.M.F., and had stable housing and a meager but steady income but that nothing satisfied DFPS.

The record reflects that Mother was given multiple opportunities to address her issues, develop the stability needed for a three-year-old child, and demonstrate her ability to maintain her mental health and that she failed to accomplish these tasks.[24] As set out above, the trial court could have found by clear and convincing evidence that Mother had failed and would continue to fail to take care of her mental health and substance abuse issues, and that such failure was and would continue to be physically and emotionally endangering to L.M.F. if Mother retained her parental rights to the child. Even discounting the evidence presented by the CPS and CASA witnesses, Mother's testimony and MHMR and JPS records illustrate her inability to understand the connections between her choices and the outcomes from those choices, as well as her lack of resources and planning with regard to the child's physical and emotional safety

---

[24]Mother agreed that she was offered CPS services in Indiana prior to relinquishing her parental rights to five children, in Texas during her first case involving L.M.F. between 2010 and 2011, and in the present case that began in December 2012; she also agreed that she was offered FBSS services in 2012.

and needs. *See Holley*, 544 S.W.2d at 371–72. In comparison, the child had had a stable placement with M.L. for over half of her life, and based on the record before us, the trial court could have formed a firm belief or conviction that adoption by M.L., as planned by DFPS if Mother's parental rights were terminated, presented the best option for the child's physical and emotional needs, now and in the future. *See* Tex. Fam. Code Ann. § 263.307(b); *R.R.*, 209 S.W.3d at 116. Therefore, under the standards of review as set out above, we conclude that the evidence is legally and factually sufficient to support the trial court's best interest finding, and we overrule Mother's third issue. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28.

## IV. Conclusion

Having overruled all of Mother's dispositive issues, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, WALKER, and MEIER, JJ.

DELIVERED: May 29, 2014

40